UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| MARY BETH MARTIN, | ) | Civil Action No.: 4:20-cv-2417-TER |
| | ) | |
| Plaintiff, | ) | **ORDER** |
| | ) | |
| -vs- | ) | |
| | ) | |
| KILOLO KIJAKAZI,[1] | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This is an action brought pursuant to Section 205(g) of the Social Security Act, as amended,

42 U.S.C. Section 405(g), to obtain judicial review of a "final decision" of the Commissioner of

Social Security, denying Plaintiff's claim for disability insurance benefits (DIB). The only issues

before the Court are whether the findings of fact are supported by substantial evidence and whether

proper legal standards have been applied. This action is proceeding before the undersigned pursuant

to 28 U.S.C. § 636(c) and Fed. R. Civ. Proc. R. 73.

## I. RELEVANT BACKGROUND

### A.     Procedural History

Plaintiff filed an application for DIB on December 20, 2013, alleging inability to work since

September 15, 2011. (Tr. 16). Her claims were denied initially and upon reconsideration.

Thereafter, Plaintiff filed a request for a hearing. A hearing was held on November 8, 2016, at which

time Plaintiff and a vocational expert (VE) testified. At the hearing, Plaintiff amended her alleged

---

[1] Kilolo Kijakazi is the Acting Commissioner of Social Security. Pursuant to Fed. R. Civ.
P. 25(d), she is automatically substituted for Defendant Andrew Saul who was the Commissioner
of Social Security when this action was filed.

onset date to December 10, 2012. (Tr. 16). The Administrative Law Judge (ALJ) issued an unfavorable decision on January 27, 2017, finding that Plaintiff was not disabled within the meaning of the Act. (Tr. 16-29). Plaintiff filed a request for review of the ALJ's decision, which the Appeals Council denied on July 12, 2017, making the ALJ's decision the Commissioner's final decision. (Tr. 1-4). Plaintiff filed an action in this court on September 8, 2017. On November 2, 2018, this court remanded based on errors in the subjective symptom evaluation and the RFC determination. (Tr. 435). The Appeals Council remanded to the ALJ in January 2019. (Tr. 469). Another hearing was held on May 31, 2019. The Administrative Law Judge (ALJ) issued an unfavorable decision on July 5, 2019, finding that Plaintiff was not disabled within the meaning of the Act. (Tr. 329-343). Plaintiff filed exceptions with the Appeals Council and the Appeals Council found no reason to assume jurisdiction on June 3, 2020. Plaintiff filed the instant action on June 25, 2020. (ECF No. 1).

**B.      Summary of Evidence**

Plaintiff was born on September 28, 1954, and was sixty-three years old on the date last insured. (Tr. 341). Plaintiff has past work experience as a packer and machine operator. (Tr. 87, 341). Plaintiff alleges disability initially due to pinched nerve in left hip and back and high cholesterol. (Tr. 66).

**2012**

It is noted on SSA documents that Plaintiff worked for three weeks in November 2012; the work was not SGA and ended due to her medical condition. (Tr. 167).

On December 14, 2012, Plaintiff was seen by Dr. Keith. (Tr. 274). Plaintiff complained of left hip pain. (Tr. 275). Plaintiff's back and sciatica were flaring up again. Plaintiff was doing domestic activities when she had a sudden pain. Straight leg raise reproduced some pain; hip

2

rotation was negative.  Impression was sciatica.  Plaintiff was prescribed prednisone, Lortab, and rest.  (Tr. 274).

**2013**

On December 16, 2013, Plaintiff was seen by Dr. Keith.  (Tr. 276).  Plaintiff had two bad places hurting in her back.  Plaintiff had lumbar spine surgery in the past and was currently having sciatica in the left L5-S1 distribution and some thoracic pain from T10 to around the front.  There was no evidence of muscular spasm upon palpation, but Plaintiff stated the pain was "pretty intense." (Tr. 276).  Assessment was degenerative joint disease.  Plaintiff was prescribed tramadol.  It was noted Plaintiff may get an MRI and pain management referral in the future.  (Tr. 276-77).  Plaintiff did not want any injections.  (Tr. 277).

**2014**

On March 13, 2014, Plaintiff was seen by Dr. Keith.   (Tr. 284).  Plaintiff's back pain had worsened.  Upon exam, Plaintiff had no obvious muscle spasm in the spine and no percussion tenderness; straight leg raise was positive on the left.  Assessment was sciatica and neuralgia. Plaintiff stated she wanted an MRI for consideration of future surgery.

On March 20, 2014, Plaintiff had an MRI of thoracic spine.  (Tr. 279).  Findings were:

Decreased disc signal intensity is noted at virtually all levels consistent with early disc desiccation.  A posterior focal central disc protrusion or extrusion is appreciated at the T5-6 level causing abutment and possible compression of the anterior or midline spinal cord.

A posterior left paracentral focal disc protrusion or extrusion is appreciated at the T6-7 level, causing indentation of the anterior thecal sac on the left without spinal cord or definite nerve root compression or impingement apparent.

A very shallow posterior focal central disc protrusion is appreciated at the T7-8 level causing minimal indentation of the anterior thecal sac without spinal cord or nerve root compromise evident.

A tiny posterior right paracentral focal disc protrusion is appreciated at the T9-10 level causing minimal indentation of the anterior thecal sac on the right without spinal cord or nerve root compromise apparent. A posterior left paracentral disc extrusion is seen at the T10-11 level extending inferiorly along the posterior margin of the superior endplate of the T11 vertebral body causing indentation of the anterior thecal sac without spinal cord or definite nerve root compression or impingement apparent. The remaining spinal canal and neural foramina are patent. The spinal cord is normal in signal intensity without focal lesions, atrophy, or enlargement apparent. No abnormal enhancement seen. Small chronic Schmorls node is seen in the inferior endplate of the T8 vertebral body. Normal bone marrow signal intensity is apparent throughout. The posterior elements are unremarkable. No perispinal soft tissue edema, masses, or fluid collections noted. No muscle strain, contusion, or atrophy apparent.

(Tr. 279). Impression of lumbar MRI was: subtle partial facetectomy defect at the L3-4 level on the left with persistent abutment of the exiting left L3 nerve root due to combined decreased disc height, bulging annulus, left sided far lateral/interforaminal focal disc protrusion and facet joint hypertrophy, minor multilevel bulging annuli with and without superimposed facet joint hypertrophy without nerve root compromise evident, and subtle multilevel facet arthropathy. (Tr. 281-82). There was mild degenerative disc disease at L2-L5 and moderately advanced degenerative disc disease at L5-S1. (Tr. 281).

On April 22, 2014, a left hip x-ray was negative. (Tr. 287).

On April 22, 2014, Plaintiff was examined by state agency consultant, Dr. Korn. (Tr. 288). Complaints were low back pain with radicular symptoms and right rib cage pain. Plaintiff stated she had surgery in 2000. Plaintiff hurt her back in 2011 and it had worsened since 2011. Plaintiff reported the pain was intermittent and in the lumbosacral junction area. Plaintiff reported the pain radiates down to her heel sometimes. Plaintiff stated sometimes walking feels better. Plaintiff could

weight bear 2-3 hours before taking a break. A 2013 MRI indicated possible impingement at L3 and some facet arthropathy. (Tr. 288). Plaintiff had an injection for the rib pain; it helped for a couple of weeks and then felt worse. (Tr. 288). "Station seems unremarkable though her balance does not appear to be great. Gait is unremarkable." (Tr. 289). "The examinee provided 60 degrees of total hip sacral motion with her demonstrations, which is exceptional effort." (Tr. 290). Plaintiff tandem walked and heel-toe walked with effort. Plaintiff did not use an assistive device and muscle weakness was not confirmed. (Tr. 290). For atrophy, there were possible borderline findings involving the thighs. (Tr. 291). Plaintiff had below average dexterity in the left hand. Diagnosis were chronic low back pain with radicular left lower extremity complaints and MRI findings of possible L3 nerve root irritation, and thoracic neuralgia consistent with post-herpetic neuralgia (without rash). (Tr. 291). Impression was: Plaintiff would benefit from weight loss and physical therapy to take pressure off the L3 nerve root which may be a cause of left lower extremity symptoms; Plaintiff should avoid activities like long-distance driving and heavy equipment operation; Plaintiff may have some difficulty with prolonged bending, leaning, and stooping and would benefit from a sit-stand option at will; not much could be done for the right rib cage except traditional medications for neuralgia. "I get the impression that it is something that she has to live with, but does not necessarily impact and is not necessarily affected by activities." (Tr. 291).

On May 22, 2014, Plaintiff's records were reviewed by state agency consultant, Dr. Adrian Corlette, M.D. (Tr. 71-74). Dr. Corlette found an RFC of lift/carry 50 pounds occasionally, lift/carry 25 pounds frequently, sit/stand/walk about 6 hours each in a workday, frequently climb ramps/stairs, balance, kneel, and crouch, and occasionally climb ladders/ropes/scaffolds, stoop, and crawl. On September 25, 2014, Dr. Mani affirmed this RFC. (Tr. 84-86).

On June 5, 2014, Dr. Keith completed an RFC questionnaire. (Tr. 293). Diagnosis were lumbar disc disease and thoracic spondylosis. Symptoms were pain in mid back and lumbar. Clinical findings were limited mobility and positive straight leg raise. Treatment was incomplete response to tramadol, amitriptyline, and NSAIDs. Plaintiff was not malingering. Plaintiff's impairments were consistent with symptoms and limitations. (Tr. 294). Plaintiff can not walk a full block. Plaintiff can sit 15 minutes and stand 10 minutes at a time. As the total for a workday, Plaintiff can stand/walk less than 2 hours and sit for about 2 hours. Plaintiff must walk every 30 minutes. (Tr. 294). Plaintiff would need unscheduled breaks. Plaintiff did not need a cane. (Tr. 295). Plaintiff could lift less than 10 pounds occasionally. (Tr. 295). Plaintiff could look down/up, turn, and hold head in static position frequently. (Tr. 295). Plaintiff could rarely twist and never climb ladders. Plaintiff could occasionally stoop, crouch, squat, and climb stairs. (Tr. 295). Plaintiff did not have limitations in reaching, handling, and fingering. "Not applicable" was the answer to absences from work and whether Plaintiff would have good days and bad days. (Tr. 296). Plaintiff needed a job that permitted shifting positions at will from sitting, standing, or walking. (Tr. 295).

On June 5, 2014, Plaintiff was seen by Dr. Keith. (Tr. 298). Plaintiff had a lot of back pain. Plaintiff had some bruises on her left arm as evidence of a fall. Plaintiff was slow to get up. Straight leg raise was positive on the left. Assessment was back pain; impression was spinal degenerative disc disease with chronic left lumbar radiculopathy. (Tr. 298). There was nothing else to do unless Plaintiff wanted to go to a specialist; Plaintiff stated she wanted to try to put up with the pain. If her gait deteriorated, Dr. Keith stated they could look at surgery again. (Tr. 299).

On June 9, 2014, Plaintiff's husband completed a third party function report. (Tr. 210). He reported they did not travel much, go shopping much, or do much of anything due to Plaintiff's

6

limitations. (Tr. 210). Plaintiff cannot "stand on her left hip too long." (Tr. 210). When Plaintiff walks, her lower back hurts. When she tries to dust, her upper right back hurts. If she is on her feet too long, her right leg swells. (Tr. 210). Plaintiff watches television and "tries to dust a little." (Tr. 211). Plaintiff's husband helps her get a bath so she does not fall. (Tr. 211). Plaintiff cannot bend without holding onto something. Sometimes, Plaintiff's husband must help her wash her hair and shave her legs. (Tr. 211). Plaintiff's sister cooks and Plaintiff washes and dries the dishes for up to an hour with rest breaks for her right leg. (Tr. 212). Plaintiff can do laundry and dust furniture. Plaintiff can go out alone and drive. (Tr. 213). Plaintiff can handle money. Plaintiff cannot lift more than five pounds. (Tr. 215). Climbing stairs causes her feet and leg to swell. Plaintiff can pay attention well.

On June 11, 2014, Plaintiff's sister completed a third party function report. (Tr. 218). Plaintiff cannot walk or sit long and has to move. (Tr. 218). Sometimes, Plaintiff dusts. (Tr. 219). Plaintiff has help to get out of the tub. Plaintiff's sister cooks. Plaintiff does laundry once a week. Plaintiff can drive and go out alone. (Tr. 221). Plaintiff has problems bending, standing, lifting, walking, reaching, and sitting. (Tr. 223). Plaintiff can walk 40 feet.

In July 2014, Plaintiff reported she could barely walk to her mailbox due to severe hip pain and that she was experiencing more pain in her upper back. (Tr. 228, 233).

On October 28, 2014, Plaintiff was seen by Dr. Cook. (Tr. 307). Plaintiff reported a decrease in balance. Plaintiff had only taken tramadol at this point. Heel walking and toe walking was normal; heel-to-toe walking was unsteady. (Tr. 308). There was no pain with range of motion testing. Plaintiff had full strength. Plaintiff was nontender to thoracic palpation. Straight leg testing was positive on left and negative on right. (Tr. 308). There was no pain with hip rotation. An x-ray

showed loss of disc height L5-S1. An MRI showed loss of T2 disc signal at L2-S1 and significant loss of disc height. (Tr. 308). Plaintiff had two different issues: 1) degenerative changes in her low back with some radiculopathy but no obvious source of stenosis causing radicular pain, for which lumbar specific therapy and Neurontin would help; 2) thoracic degenerative disc disease with thoracic nerve root pain, for which Neurontin and physical therapy would also help to benefit. Injections would be considered in the future. (Tr. 309).

On November 25, 2014, Plaintiff was seen by Dr. Cook. (Tr. 305). Plaintiff had thoracic pain. Plaintiff had full strength in lower extremities with no sensory deficits. Plaintiff's MRI reflected disc bulges at T5-6 and T6-7 that caused indentation of the ventral cord with abutment to exiting root. (Tr. 306). Plaintiff had "right-sided thoracic pain that is likely coming from her T5-6 disc bulge." Plaintiff was referred to see if she could get a thoracic root block to localize pain.

On December 10, 2014, Plaintiff was seen by Dr. Jasper. (Tr. 302). Plaintiff complained about thoracic nerve pain and low back pain radiating down left leg. Plaintiff had a month of physical therapy without relief. Plaintiff had injections seven years prior with one week of relief. Plaintiff denied any falls. Plaintiff had only taken tramadol for these issues. MRIs showed disc protrusion at T5-7 and at L5-S1. (Tr. 302). Upon exam, Plaintiff had normal hip range of motion, tenderness over right paramidline mid-thoracic spine segment and tenderness over the left PSIS. Spine range of motion was grossly intact with no pain at end ranges, with extension and rotation there was minimal pain. (Tr. 303). Neural tensions signs were "negative slump in right, positive in the left lower limb." Muscle tone and strength was normal. Assessment was lumbosacral radiculopathy, lumbar spondylosis, lumbar disc displacement, and thoracic intervertebral disc displacement. (Tr. 304). An injection was to be scheduled. "No bed rest needed at this time. May

8

resume normal activity as tolerated." (Tr. 304).

**2015**

On July 24, 2015, Plaintiff was seen by Dr. Keith. (Tr. 311). Plaintiff had thoracic pain syndrome that was getting intolerable. Plaintiff was interested in going back to a neurosurgeon. Plaintiff stated it hurt so bad she was concerned she had cancer. Assessment was fibrositis with an injection given in right mid back area trigger point. Impression was thoracic and lumbar spondylosis.

On December 23, 2015, Plaintiff was seen by Dr. Keith. (Tr. 317). Plaintiff's right shoulder had limited motion and pain; Plaintiff declined an injection. Medications were prescribed.

**2016**

On February 15, 2016, Plaintiff was seen by Dr. Keith. (Tr. 315). Plaintiff's pain syndrome was increasing, which was in the right anterior rib cage originating from her thoracic spine. Upon exam, when pressed, there was no tenderness of ribs. Norco was prescribed. (Tr. 316).

On August 23, 2016, Plaintiff was seen by Dr. Keith for right shoulder pain. (Tr. 313). Plaintiff had limited motion. Plaintiff also had some lesions on her face. Plaintiff could not fully raise her arms over her head. Assessment was bursitis and probable rotator cuff problems. (Tr. 313).

On October 6, 2016, Dr. Keith stated he reviewed his 2014 questionnaire and the findings were still accurate and the restrictions were applicable back to at least November 2012. (Tr. 319).

**2017**

On February 21, 2017, Plaintiff was seen by Dr. Keith for her regular checkup. Plaintiff reported a right rib to back area of pain with burning. Plaintiff continued smoking. (Tr. 655). Upon exam, Plaintiff was in no distress. Plaintiff had scattered wheezing, rhonchi, and decreased breath sounds. Assessments included COPD and pleurodynia. Plaintiff had been treated with Lidoderm

patches. (Tr. 656). Tramadol was refilled; a cream and patch were prescribed. (Tr. 656).

In March of 2017, additional mammogram imaging showed skin calcifications corresponding to the mammographic finding in the right breast, no findings worrisome for malignancy. (Tr. 723).

On April 5, 2017, Plaintiff was seen by Dr. Mitchell of Carolina Orthopaedic and Neurosurgical Associates. (Tr. 668). Plaintiff complained of radiating right sided thoracic pain. Plaintiff had the same problem three years prior and was told there was no operative intervention needed. "The patient walks with a good gait." (Tr. 668). Plaintiff reported a pain level of 8. Upon exam, Plaintiff was in no acute distress and had normal gait. Plaintiff had intact deep tendon reflexes, negative straight leg raise, and normal range of motion. Plaintiff described a little bit of left hip pain when she lays on her left hip and reported she felt the nerve being pinched in the lower lumbar and had been worked up for that in the past. Thoracic x-rays showed no acute abnormalities. "She has neurocutaneous stigmata of her thoracic spine." Assessment was thoracic back pain and an MRI was ordered. (Tr. 670).

On April 17, 2017, an MRI showed mild T2 signal loss with no significant disc space narrowing, a very small central disc protrusion and mild compression of thecal sac at T5-T6, no spinal stenosis, a very small right-sided disc protrusion with minimal compression of the thecal sac at T7-8, small right sided disc protrusion with mild compression of thecal sac at T9-T10, and thoracic spinal cord was normal in size and signal intensity. (Tr. 672). Impression was small multilevel disc protrusion. (Tr. 673).

On April 19, 2017, Plaintiff was seen by Dr. Mitchell. (Tr. 674). Plaintiff reported thoracic pain for 14 years. Plaintiff reported she tried injections and physical therapy. Plaintiff reported medications had not resolved her pain. Plaintiff rated her pain a nine. (Tr. 674). Upon exam, Plaintiff

10

was in no acute distress with normal gait. (Tr. 675). "Patient walks with a normal gait, slight favoring of the left hip. She has pain with right-sided motion of her thoracic spine, tenderness upon palpation of the bra strap area over toward the right side. Plaintiff had a very pleasant affect. (Tr. 676). Assessment was thoracic spine pain. Plaintiff was referred to pain management as Plaintiff was not a surgical candidate because there were no operative lesions. (Tr. 676).

On July 13, 2017, Plaintiff was seen by Dr. Behr of Carolina Orthopaedic and Neurosurgical Associates. (Tr. 681). Plaintiff reported gabapentin did not help her pain much. Plaintiff was interested in epidurals and nerve blocks. (Tr. 681). Upon exam, Plaintiff was in no acute distress and had normal gait. With palpation, there was "no pain with deep inspiration, really very minimal pain with palpation. The pain is mainly in the T6 maybe T7 distribution." (Tr. 682). Deep tendon reflexes were normal. Manual muscle testing was 5/5. Thoracic facet loading was negative. Plaintiff had only minimal pain with forward flexion. Plan was increase gabapentin and set up appointments for epidural steroid injection and nerve block. Plaintiff was to continue home exercise program. (Tr. 683).

On August 2, 2017, Plaintiff received epidural steroid injection. (Tr. 685). On August 16, 2017, Plaintiff received intercostal nerve block. (Tr. 686).

On August 9, 2017, Plaintiff was seen for midback pain by Dr. Behr. (Tr. 677). Plaintiff reported her thoracic pain was made better with sitting and walking. Plaintiff reported tramadol helped a little and an injection fifteen years prior did not help. (Tr. 677). Upon exam, Plaintiff was in no acute distress and had normal gait. With palpation, there was "no pain with deep inspiration, really very minimal pain with palpation. The pain is mainly in the T6 maybe T7 distribution." (Tr. 679). Deep tendon reflexes were normal. Manual muscle testing was 5/5. Thoracic facet loading was

11

negative. Plaintiff had only minimal pain with forward flexion. MRIs were reviewed. Assessment was "now with radiating right-sided chest wall pain that is likely related to the T6 radiculopathy or intercostal neuralgia." (Tr. 679). Gabapentin was increased; if that did not produce improvement, an epidural would be considered, and if that did not work then a nerve block followed by radiofrequency ablation with the last option being a spinal cord stimulator. (Tr. 680).

On August 21, 2017, Plaintiff was seen by Dr. Keith of family medicine. (Tr. 653). Plaintiff reported she was going to pain management and getting shots but they were not helping. "She really is just here to get her medications refilled." "In general, her condition is unchanged." Upon exam, Plaintiff was in no distress; lung breath sounds were slightly decreased but otherwise clear. Extremities had no edema. (Tr. 653). Assessments were hyperlipidemia, hypothyroidism, and unspecified osteoarthritis. (Tr. 653). Amitriptyline, Simvastatin, and tramadol(for pain) were refilled. (Tr. 654).

On August 31, 2017, Plaintiff was seen by Dr. Behr. Plaintiff reported no relief from the epidural. Plaintiff reported quite a bit of relief for one week from the nerve block. Plaintiff rated pain as a five. Plaintiff continued gabapentin and tolerated it well. (Tr. 687). Later, pain is rated as a nine. (Tr. 687). Upon exam, Plaintiff was in no acute distress and had normal gait. With palpation, there was "no pain with deep inspiration, really very minimal pain with palpation. The pain is mainly in the T6 maybe T7 distribution." (Tr. 689). Deep tendon reflexes were normal. Manual muscle testing was 5/5. Thoracic facet loading was negative. Plaintiff had only minimal pain with forward flexion. Plan was to repeat the nerve block as Plaintiff did get significant relief from it for a week. If Plaintiff received relief again, then strong consideration of radiofrequency ablation would be given. Gabapentin was refilled. Plaintiff was to continue home exercise program. (Tr. 690).

Plaintiff reported to SSA in September 2017 that she did dusting for ten minutes before taking a break due to middle back pain. Plaintiff reported she dusts lower shelves by sitting on the floor because she cannot bend over. Plaintiff reported she has to stop a few times walking to the mailbox 30-50 feet away but does not use a cane. Plaintiff does not shop. Plaintiff stated reaching to comb her hair caused back pain. (Tr. 411).

On September 18, 2017, Plaintiff received an intercostal nerve block again. (Tr. 691).

On September 28, 2017, Plaintiff was seen by Dr. Behr. (Tr. 731). Plaintiff received significant relief from the nerve block better than the epidural. Plaintiff wanted to hold off on an ablation. Plaintiff felt she was doing well enough with the nerve block and the gabapentin. (Tr. 731). Pain was a six. Upon exam, Plaintiff was in no acute distress and had normal gait. With palpation, there was "no pain with deep inspiration, really very minimal pain with palpation. The pain is mainly in the T6 maybe T7 distribution." (Tr. 733). Deep tendon reflexes were normal. Manual muscle testing was 5/5. Thoracic facet loading was negative. Plaintiff had only minimal pain with forward flexion.  Straight leg raise was positive on the left. (Tr. 733). Later on the same page, gait is noted as tandem and antalgic. "She now complains of low back pain and radiating left lower extremity pain likely related to a combination of failed back surgery syndrome, degenerative disc disease, and radiculopathy." (Tr. 734). An MRI was ordered. Plaintiff was to continue back brace and home exercise. Plaintiff felt well enough to hold off on other considerations. (Tr. 734).

On October 12, 2017, nonexamining state agency consultant, Dr. Patton opined that Plaintiff had severe degenerative disc disease and severe disorders of muscle, ligament, and fascia. (Tr. 412). Dr. Patton opined a medium RFC. (Tr. 413-414). Plaintiff could occasionally stoop/crawl, and frequently climb ramps/stairs, kneel, and crouch. (Tr. 414). Dr. Patton found there was no significant

worsening from the prior decision and allegations were not fully supported by the objective evidence. (Tr. 415).

On October 19, 2017, a lumbar MRI impression was disc dessiccation, annular bulges, and facet arthropathy throughout, shallow right disc protrusion at L2-3, broad-based shallow disc protrusion on the left at L3-4 that may be affecting exiting left L3 nerve root. Mild foraminal stenosis was noted. (Tr. 730).

**2018(after DLI)**

In February 2018, Plaintiff reported to SSA that she still could only walk 50 feet with rest. Plaintiff reported she sat to cook. Plaintiff reported she could drive for 15 minutes. (Tr. 424).

On February 21, 2018, Plaintiff was seen by Dr. Keith. (Tr. 696). Plaintiff reported taking mostly Tylenol and tramadol for her back pain. Upon exam, Plaintiff was in no acute distress and had no edema. (Tr. 697).

In March 2018, nonexamining state agency consultant Dr. Nabors found Plaintiff had severe impairments of degenerative disc disease and disorders of muscle, ligament, and fascia and nonsevere impairment of COPD. (Tr. 424). Dr. Nabors opined a medium RFC with similar postural limitations as Dr. Patton. (Tr. 426-427). Dr. Nabors stated Plaintiff had mild disc bulges *without* evidence of radiculopathy and nerve blocks were documented as effective. (Tr. 427).

On May 18, 2018, Plaintiff was seen by Dr. Keith. Plaintiff reported loss of energy and diarrhea. (Tr. 973). Imodium and Ultram were prescribed. It was noted withdrawal from Ultram(tramadol) might be a factor to how Plaintiff was feeling. (Tr. 974).

On May 20, 2018, Plaintiff was seen in the emergency room with generalized weakness. Plaintiff reported chronic diarrhea. Plaintiff recently stopped taking potassium. (Tr. 816). Upon

exam, Plaintiff was in no acute distress. Plaintiff's chest wall had no tenderness to palpation. Abdominal was normal. (Tr. 817). Back had no CVA tenderness. Plaintiff was offered admission but declined. (Tr. 822). Plaintiff was prescribed Klor-Con. Impression was dehydration, orthostatic low blood pressure, hypoketosis, and leukocytosis. (Tr. 823).

On September 16, 2018, Plaintiff was seen in the emergency room for abdominal pain and weakness. Plaintiff was able to ambulate without assistance at baseline. (Tr. 898). Upon exam, Plaintiff was in no acute distress. Abdominal exam was normal. Back had no CVA tenderness. Extremities were normal with full range of motion. (Tr. 900). Plaintiff was prescribed Klor-Con and Zantac. (Tr. 903). Adequate oral hydration was stressed.

On September 25, 2018, Plaintiff completed a mobility questionnaire. (Tr. 626). Plaintiff reported pain was in left hip and ran down the back of left leg. Plaintiff reported pain in the right middle back. (Tr. 625). Plaintiff reported medications of Tylenol, tramadol, and Gabapentin, but that nothing helps the pain. Plaintiff walks to the mailbox three times a week. Plaintiff cannot get out of the tub by herself. (Tr. 625). Plaintiff reported she had problems walking but did not need a cane. (Tr. 626). Plaintiff reported she could not reach for things overhead. (Tr. 626). Plaintiff reported she could lift 5 pounds but could not lift a gallon of milk. Plaintiff cannot walk more than five minutes because every step hurts the middle of her back. (Tr. 626).

On September 28, 2018, Plaintiff was seen by Dr. Keith. (Tr. 964). Plaintiff reported her potassium had been low and the medication gives her diarrhea. (Tr. 964). Gabapentin and other medications were refilled. Assessment was leukocytosis and hypokalemia. (Tr. 966).

On December 31, 2018, Plaintiff was seen by Dr. Keith. (Tr. 962). Plaintiff was mainly interested in getting her medication refilled. Upon exam, Plaintiff had no edema. (Tr. 963). Synthroid

and Ultram were refilled. Assessment was hypokalemia. (Tr. 963).

**2019**

On April 15, 2019, Dr. Keith completed an opinion form. (Tr. 978). Plaintiff could lift less than ten pounds frequently and basis for such were physical exam and abnormal MRI findings. Plaintiff was limited to one hour of stand/walk in a workday. (Tr. 977). Plaintiff was limited to four hours total of sitting in a workday. (Tr. 977). Plaintiff needed to elevate her legs frequently. Plaintiff could never climb or crawl. Plaintiff could rarely stoop. (Tr. 977). Diagnosis were confirmed by objectives. (Tr. 978). Opinion was based primarily on Plaintiff's subjective complaints. (Tr. 978). Plaintiff had no side effects. (Tr. 978). Nothing in the form indicates what time period or any retroactivity to the opinion and was over a year beyond the DLI.

**C.    The Administrative Proceedings**

**1.    The Administrative Hearing**

**a.    Plaintiff's Testimony**

On November 8, 2016, Plaintiff appeared, with her attorney, at a hearing before ALJ Gregory M. Wilson. (Tr. 34). Dr. Brabham testified as an impartial vocational expert (VE). The attorney argued that when Plaintiff was working for Amazon she was having balance problems and was falling and that the record showed due to her reason for leaving Amazon that she would be limited to sedentary work and Grid 201.06 would apply. (Tr. 37-38). Plaintiff was sixty-two at the hearing. (Tr. 39). Plaintiff lived with her sister and husband. Plaintiff testified she did make an unemployment claim and collected benefits for six months. (Tr. 39-40). Plaintiff testified she told them she was capable of working and looked for any kind of work, three places a week. (Tr. 40). Plaintiff was making spark plugs when she was laid off. (Tr. 40). Plaintiff had pain in her lower and

16

center back and left leg and hip. (Tr. 41). Plaintiff had seen Dr. Keith for 25 years. Plaintiff's back started affecting her work in 2004 and 2005 and Plaintiff continued to work. At her job, Plaintiff "put the depth in the spark plugs, and then when they [would] come running out of the machine, we'd have to take scoops, pick up the shells, and scoop them in a hopper." (Tr. 42). Plaintiff's job was a standing/walking job. Heaviest weight lifted frequently was 25 pounds. Plaintiff was laid off in 2011. It appears then Plaintiff testifies she drew unemployment in 2011 and may be referring to prior testimony. (Tr. 42). Then, after drawing unemployment, Plaintiff worked for Amazon in shipping with walking/standing. (Tr. 42-43). Plaintiff worked at Amazon for two months, fell at her home, injured her foot, and quit. (Tr. 43). Plaintiff's falling problems worsened in 2014. (Tr. 43). Plaintiff's pain would run down her lower back, left hip, to her foot. (Tr. 43-44). Plaintiff testified she saw Dr. Keith on June 5, 2014 for her foot and leg injury. (Tr. 44). Plaintiff fell twice a week, but she did not have to go to the hospital for falling. (Tr. 44). Plaintiff's typical pain level for her low back was 5-6, middle back pain was 7-8, and left hip pain was 6-7. (Tr. 45-46). Plaintiff's husband helps her in and out of the tub and follows her around the house because he is afraid she will fall. (Tr. 46). Plaintiff testified now she could stand 15 minutes and sit 20-30 minutes. Plaintiff has to sit and walk intermittently. (Tr. 47). Dr. Keith had mentioned future surgery. Plaintiff testified she was doing physical therapy the week before the hearing for her right arm and shoulder. (Tr. 48-49). Plaintiff has headaches two to three times a week. (Tr. 49). During the day, Plaintiff makes her bed, watches television, sits on the porch, walks in the yard, and sits in the recliner. (Tr. 50). Plaintiff dusts the floors with a mop. (Tr. 50-51). Her sister cooks and does the laundry. Plaintiff goes out to eat twice a week. (Tr. 51). Plaintiff cannot sit through an entire church service and walks around. (Tr. 52). Plaintiff's medication hurts her stomach. (Tr. 52).

17

Plaintiff testified she sleeps 3-4 hours a night; Plaintiff gets up and walks around. (Tr. 53-54). Plaintiff testified she could not hold anything due to her right shoulder. (Tr. 55). Plaintiff testified she had done dishes five times since 2012. Plaintiff testified she folds clothes, sweeps, goes to the store, and drives twice a week. (Tr. 56-59). Plaintiff's attorney argued if Plaintiff was limited to sedentary, she would "grid out." (Tr. 64-65).

At the second hearing, on May 31, 2019, Plaintiff appeared, with her attorney, at a hearing before ALJ Gregory M. Wilson. (Tr. 353). Tricia Muth testified as an impartial vocational expert (VE). The ALJ acknowledged the case had been remanded and stated: "I'm not sure what we need to do entirely." Plaintiff's attorney further noted: "My understanding from the court that her subjective complaints needed to be reevaluated." (Tr. 355). Plaintiff's attorney stated the ALJ needed to update the impairments from the last findings, that radiculopathy needed to be addressed. (Tr. 356).

Plaintiff testified her worst medical problem was the pain in the middle of her back and that wraps around. (Tr. 360). Plaintiff described the pain as constant and stabbing from a 7 to a 9. (Tr. 361). Plaintiff takes two tramadol and two Tylenol four times a day. (Tr. 361). Plaintiff had four injections in her thoracic spine; they only helped for a short period of time. (Tr. 362). Plaintiff has trouble putting on clothes. (Tr. 362). Plaintiff has pain in her left hip that runs down her leg and foot. (Tr. 363). Plaintiff stated she could stand for 15 minutes and sit for 30 minutes. (Tr. 363). Plaintiff can walk 25 yards without a cane. (Tr. 364). Plaintiff reported migraines for forty years. Plaintiff lays down with headaches. (Tr. 364). Plaintiff reported she could lift 10 pounds only with two hands. (Tr. 365). Plaintiff had falls and  bruises from falls. (Tr. 365). Plaintiff reported she fell the prior month when her left leg just gave out. (Tr. 366). Plaintiff testified the pain was too great to work. Plaintiff

drives eight miles once a week. (Tr. 367). Plaintiff takes Tylenol, tramadol, and gabapentin. (Tr. 368). Plaintiff stopped cooking a year prior. Plaintiff does dishes every once in awhile. Plaintiff can fold clothes. (Tr. 369). Plaintiff stopped attending church a year prior due to chairs hurting her back. (Tr. 370).

The ALJ asked Plaintiff's attorney to point out an MRI that had foraminal or central canal stenosis. (Tr. 377-378). The ALJ read out loud one MRI that had mild foraminal stenosis. (Tr. 378). Plaintiff's attorney stated that just because she did not have spinal stenosis did not mean she was not experiencing pain. There was compression of the thecal sac. (Tr. 379).

### b.    Vocational Evidence

The VE classified Plaintiff's past work as machine operator, medium, SVP 3, DOT 619.685-062.  (Tr. 60).

The VE opined that past work as actually performed and as generally performed was available for an individual of Plaintiff's age, education, and prior work experience who retained the ability to lift 50 pounds occasionally, 25 pounds frequently, stand/walk/sit six hours each, occasional on ropes/ladders/scaffolds/stoop/crawl, and frequently climb/balance/kneel/crouch /overhead reach. (Tr. 60).  Given the hypothetical, other jobs were available: assembler jobs and hand packer jobs. (Tr. 61).  The jobs included still complied even with occasional stooping and overhead reaching. (Tr. 61-62).

Under hypothetical two, same as the first but with absences frequently from the workstation, which could vary between minutes one day and hours another day, the VE testified that while not addressed by the DOT, this was addressed by other publications and could not be more than about one absence a month and being off task 5%.  5% was all that most employers could accommodate,

as such the limitation would eliminate all jobs. (Tr. 62-63). Under another hypothetical by Plaintiff's attorney, the VE testified that less than 10 pounds would not be the full range of sedentary and would eliminate all jobs. (Tr. 63).

At the second hearing, the VE opined past work was available for an individual of Plaintiff's age, education, and prior work experience who retained the ability to lift 50 pounds occasionally, 25 pounds frequently, stand/walk/sit six hours each, occasional on ropes/ladders/scaffolds/stoop/crawl, and frequently climb/balance/kneel/crouch /overhead reach. (Tr. 373). Given the hypothetical, other jobs were available: hand packager, laundry worker, and dining room attendant. (Tr. 374). The ALJ indicated that occasional stooping may preclude medium work. (Tr. 375). The VE testified she observed these jobs only required occasional stooping. (Tr. 375).

## 2.    The ALJ's Decision

In the decision of July 5, 2019, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant last met the insured status requirements of the Social Security Act on December 31, 2017.

2.    The claimant did not engage in substantial gainful activity during the period from her alleged onset date of December 10, 2012 through her date last insured of December 31, 2017 (20 CFR 404.1571 *et seq.*).

3.    Through the date last insured, the claimant had the following severe impairments: degenerative disc disease of the lumbar and thoracic spine (20 CFR 404.1520(c)).

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, I find that, through the date

20

last insured, the claimant had the residual functional capacity to perform reduced medium work as defined in 20 CFR 404.1567(c). She was able to lift 50 pounds occasionally and 25 pounds frequently. She was able to sit, stand and walk for six hours in an eight-hour workday. She was able to occasionally climb ropes, ladders and scaffolds; stoop; and crawl. She was able to frequently climb ramps and stairs, balance, kneel, and crouch. She was also able to frequently engage in overhead reaching. She must have avoided hazards.

6.    Through the date last insured, the claimant was capable of performing past relevant work as a machine operator. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.    The claimant was not under a disability, as defined in the Social Security Act, at any time from December 10, 2012, the alleged onset date, through December 31, 2017, the date last insured (20 CFR 404.1520(f)).

## II. DISCUSSION

Plaintiff argues the ALJ erred in failing to identify thoracic and lumbar radiculopathy as severe impairments and failed to consider those in determining the RFC. Plaintiff argues the ALJ improperly rejected Plaintiff's subjective complaints of pain and fatigue. Plaintiff argues ALJ erred in finding Plaintiff had a medium RFC. Plaintiff argues the ALJ improperly weighed Dr. Keith's opinions.  The Commissioner argues that the ALJ's decision is supported by substantial evidence.

## A.    LEGAL FRAMEWORK

### 1.    The Commissioner's Determination–of–Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  Section 423(d)(1)(A) defines disability as: the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12

21

consecutive months.  42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions.  *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting the "need for efficiency" in considering disability claims).  An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity ("SGA"); (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such impairment prevents claimant from performing PRW;[3] and (5) whether the impairment prevents him from doing SGA.  See 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do.  The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525.  If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment.  20 C.F.R. § 404.1520(a)(4)(iii).  To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria."  20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. See 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [ ] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases *de novo* or resolve mere conflicts in the

23

evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157-58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir.1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157-58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). Substantial evidence as a threshold is "not high;" "[u]nder the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

**B.     ANALYSIS**

**<u>Opinions</u>**

Plaintiff argues the ALJ improperly weighed Dr. Keith's opinions.

The Social Security Administration's regulations provide that "[r]egardless of its source, we will evaluate every medical opinion we receive." 20 C.F.R. § 404.1527(c). Generally, more weight is given to the opinions of examining physicians than nonexamining physicians. More weight is given to the opinions of treating physicians since they are more likely to be able to provide a detailed, longitudinal picture of a claimant's medical impairment. *See* 20 C.F.R. §§ 416.1 527(c). The medical opinion of a treating physician is entitled to controlling weight, i.e., it must be adopted

by the ALJ, if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.  *See* 20 C.F.R. § 404.1 527(c)(2), SSR 96-2p, and *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence, it should be accorded significantly less weight."  *Craig v. Chater*, 76 F.3d 585,590 (4th Cir. 1996).  Under such circumstances, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence."  *Mastro*, 270 F.3d at 178 (citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)).

State agency medical consultants "are highly qualified ...who are also experts in Social Security disability evaluation.  Therefore, administrative law judges must consider findings and other opinions of State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists as opinion evidence, except for the ultimate determination about whether you are disabled."  20 C.F.R. § 404.1527(e).

In determining what weight to give the opinions of medical sources, the ALJ must apply the factors in 20 C.F.R. § 404.l527(c)(1)-(6), which are: whether the source examined the claimant; whether the source has a treatment relationship with the claimant and, if so, the length of the relationship and the frequency of examination; the nature and extent of the treatment relationship; the supportability and consistency of the source's opinion with respect to all of the evidence of record; whether the source is a specialist; and, other relevant factors.  *See* SSR 96-2p; *Hines v. Barnhart*, 453 Fd 559,563 (4th Cir. 2006).

Even when a treating opinion is not entitled to controlling weight, "it does not follow that the ALJ ha[s] free reign to attach whatever weight to that opinion that he deem[s] fit." *Dowling v.*

25

*Comm'r of Soc. Sec. Admin.*, 986 F.3d. 377, 385 (4th Cir. 2021). It must be "apparent from the ALJ's decision that he meaningfully considered each of the factors before deciding how much weight to give the opinion." *Id.* at *5. The Fourth Circuit Court of Appeals found where only the factors of supportability and consistency were discussed by the ALJ and other factors of length, frequency, nature, and extent of treating relationship were ignored, it was error necessitating remand. *Id.* at *5. "20 C.F.R. § 404.1527(c) requires ALJs to consider *all* of the enumerated factors in deciding what weight to give a medical opinion." *Arakas v. Comm'r of Soc. Sec. Admin.*, 983 F.3d 83, 107 n.16 (emphasis in original).

Dr. Keith opined Plaintiff needed a job that permitted shifting positions at will from sitting, standing, or walking. (Tr. 295). The ALJ gave little weight stating it was inconsistent with treatment records and not supported by any other opinions "issued by medical experts in this matter." (Tr. 339-340). However, Dr. Korn opined Plaintiff would benefit from a sit-stand option at will. (Tr. 291). Both Dr. Korn and Dr. Keith reviewed the MRIs that showed decreased disc signal intensity at virtually all levels consistent with early disc desiccation, a posterior focal central disc protrusion or extrusion at the T5-6 level causing abutment and possible compression of the anterior or midline spinal cord, facetectomy defect at the L3-4 level on the left with persistent abutment of the exiting left L3 nerve root, and moderately advanced degenerative disc disease at L5-S1. (Tr. 279, 281).

In analyzing Dr. Korn's opinion of a sit/stand option,  the ALJ stated the MRIs supported the opined restriction against prolonged bending/stooping, but that the MRI evidence did not support the opined sit/stand option. There is no reasoning given by the ALJ why this would be the case. Further, the ALJ in analyzing Dr. Korn's opinion stated Dr. Cook did not offer an opinion that such limitations would be appropriate. However, Dr. Cook did not provide any opinions one way or the

other. It is evident from the record that as to some limitations, Dr. Korn supports Dr. Keith and vice versa; the ALJ erred in not analyzing this as to the factors of supportability and consistency.[4] Further, Plaintiff was seen by Dr. Keith repeatedly since 2012. Plaintiff only saw Dr. Cook a total of two times, once in October 2014 and once in November 2014. (Tr. 306, 309).

Even Dr. Cook noted that Plaintiff's right sided thoracic pain was likely coming from the MRI evidence of the T5-T6 disc bulge. (Tr. 306). Further, specialist Dr. Behr noted in 2017 that MRIs were reviewed and Plaintiff's radiating chest pain was likely related to T6 radiculopathy. (Tr. 679). This further supports Plaintiff's other arguments of errors in the subjective symptom evaluation, the severity rating of impairments, and the RFC determination where Plaintiff argues pain causes limits related to radiculopathy. Plaintiff's radiating pain was not without support from imaging and diagnosis from specialists. (Tr. 298, 309, 306, 303-04, 679, 734). It is important to note many specific limits eschewed by the ALJ are highly relevant to a medium RFC and are outcome determinative errors where Plaintiff was sixty-three years old at the DLI, had the abnormal thoracic and lumbar MRI findings and objective exams of record, and yet was found by the ALJ to be able to lift 50 pounds occasionally and sit, stand, and walk for six hours in an eight-hour workday. Any reduction in the RFC based on the opinions or the subjective symptom evaluation may cause Plaintiff to "grid out" and be categorized as disabled. *See* Part 404 App. 2, Subpart P, Grid Rule 202.06(if limited to light/less than medium).

---

[4] The undersigned notes that the doctors' opinions issues of the prior 2017 ALJ decision was affirmed in the prior court action but that 2017 ALJ decision was vacated as a result of the remand. However, the same 2017 ALJ opinion previously analyzed by the court does not exist before us, and further, the Fourth Circuit Court of Appeals has provided published case law on these issues since that prior court opinion. *See Dowling v. Comm'r of Soc. Sec. Admin.*, 986 F.3d. 377, 385 (4th Cir. 2021); *Arakas v. Comm'r of Soc. Sec. Admin.*, 983 F.3d 83, 107 n.16 (4th Cir. 2021).

Based on these errors, it is not clear whether substantial evidence supports the RFC determination found by the ALJ which necessarily relies on the opinion evaluations and the subjective symptom evaluation. All the issues raised by Plaintiff's briefs should be addressed on remand by the ALJ.

### III. CONCLUSION

In conclusion, it may well be that substantial evidence exists to support the Commissioner's decision in the instant case. The court cannot, however, conduct a proper review based on the record presented. Accordingly, pursuant to the power of the Court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in social security actions under sentence four of Sections 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. Sections 405(g) and 1338(c)(3), it is ordered that the Commissioner's decision be reversed and that this matter be REMANDED to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings in accordance with this opinion.


                                                            s/ Thomas E. Rogers, III

October 25, 2021                                    Thomas E. Rogers, III
Florence, South Carolina                      United States Magistrate Judge